| | |
|---|---|
| **DISTRICT COURT, CITY AND COUNTY OF DENVER COLORADO**<br>1437 Bannock Street, Room 256<br>Denver, Colorado 80202<br>720-865-8301 | DATE FILED: April 17, 2018 2:29 PM<br>FILING ID: 6597290B6655B<br>CASE NUMBER: 2018CV31358 |

**Plaintiff:** JMAN2 GENERAL III, LP, a Delaware limited partnership

v.

**Defendant:** MUSCLEPHARM CORPORATION, a Nevada corporation

▲ **COURT USE ONLY** ▲

*Attorneys for Plaintiff*

Case Number:

Courtroom:

Bradley E. Beckworth (pro hac vice forthcoming)
Jeffrey J. Angelovich (pro hac vice forthcoming)
Cody L. Hill (pro hac vice forthcoming)
NIX, PATTERSON & ROACH, LLP
3600B N. Capital of Texas Hwy., Suite 350
Austin, TX 78746
Tel: (512) 328-5333
Fax: (512) 328-5332
jangelovich@nixlaw.com
bbeckworth@nixlaw.com
codyhill@nixlaw.com

Valeri S. Pappas #29939
Jennifer A. Tiedeken, #42674
DAVIS & CERIANI, P.C.
1600 Stout Street, Suite 1710
Denver, Colorado 80202
Tel: (303) 534-9000
Fax: (303)534-4618
vpappas@davisandceriani.com
jtiedeken@davisandceriani.com

## COMPLAINT AND JURY DEMAND

Plaintiff, JMAN2 General III, LP ("Plaintiff" or "JMAN2"), for its Complaint against Defendant, MusclePharm Corporation ("Defendant" or "MusclePharm" or the "Company"), alleges and states as follows:

## NATURE AND SUMMARY OF ACTION

1.      JMAN2 entered an endorsement agreement with MusclePharm (the "Agreement") under which MusclePharm contracted to pay JMAN2 a total of $1,000,000.00 in specifically identified, periodic installment payments in exchange for JMAN2's endorsement of MusclePharm's business, products and services. *See* Exhibit 1 hereto (the Agreement).

2.      Although JMAN2 fully performed its obligations under the Agreement, MusclePharm never paid one cent of the funds it promised and owed JMAN2 under the Agreement, including $425,000.00 in mandatory installment payments, which the Agreement required MusclePharm to pay in bargained-for installments on specifically negotiated dates in 2014 and 2015 (the "Installment Payments").

3.      Instead, MusclePharm intentionally designed and willfully executed a campaign to thwart JMAN2's contractual rights under the Agreement, as part of a corporate decision to cut costs and try to salvage the Company's hemorrhaging stock price.

4.      JMAN2 brings this action to finally make MusclePharm honor its promises, hold MusclePharm accountable for its debts and recover what JMAN2 is rightfully owed under the Agreement—the $425,000.00 in long past due Installment Payments, which the Agreement required MusclePharm to pay in specifically bargained-for amounts on specifically bargained-for dates in 2014 and 2015.

## PARTIES, JURISDICTION AND VENUE

5.      Plaintiff, JMAN2, is a limited partnership, organized under the laws of the State of Delaware, that manages the business dealings of one of its partners (hereinafter, "Endorser"). JMAN2 is a citizen of the States of Texas and Delaware and a resident of Texas.

6.      Defendant, MusclePharm, is incorporated in the State of Nevada, is registered to do business in the State of Colorado and maintains its principal place of business and principal executive offices in Denver, Colorado, at 4721 Ironton Street, Denver, Colorado 80239. Thus, MusclePharm is a citizen of the State of Colorado. MusclePharm's common stock is publicly traded under the symbol MSLP on the U.S. over-the-counter market and quoted on the OTCQB Marketplace.

7.      This Court has general jurisdiction over MusclePharm because the Company maintains its principal place of business and principal executive offices in Colorado, meaning the Company is "at home" in this State. This Court has specific jurisdiction over MusclePharm because the Company has sufficient contacts with the State to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice, and because MusclePharm committed all or a substantial part of the specific acts that give rise to JMAN2's claims and causes of action described herein in this State.

8.      This Court has subject matter over this action because JMAN2 seeks damages in excess of $15,000, and because MusclePharm committed some or all of the acts described herein in this State, was obligated to perform the Agreement in this State and expressly agreed that any controversy or dispute arising under the Agreement could be resolved by "litigation in a court of competent jurisdiction in Denver County, Colorado." Ex. 1 at ¶22.

9.      Venue is proper in this Court under Colorado Rule of Civil Procedure 98(c) because MusclePharm resides in Denver County, can be found in Denver County and was obligated to perform the Agreement described herein in Denver County.

10.     Venue also is proper in this Court based on the forum selection clause contained in the Agreement, which provides that:

> Any controversy, dispute or question arising under this Agreement shall be determined, if possible, by good faith mediation, arbitration or comparable alternative dispute resolution proceedings agreed to by the parties. In the event the parties cannot agree upon alternative dispute resolution procedures to resolve their disagreements, then either party may resort to litigation in a court of competent jurisdiction in Denver County, Colorado.

Ex. 1 at ¶22. While the foregoing provision does not mandate the use of mediation, arbitration or comparable procedure, JMAN2 nonetheless attempted in good faith to resolve this dispute prior to filing suit. MusclePharm ignored these efforts outright. Thus, such resolution is not possible and JMAN2 has brought this suit.

11.     Specifically, on April 10, 2017, JMAN2 sent a letter via FedEx courier invoking the dispute resolution procedure quoted above. This letter was sent to MusclePharm's then-Interim CEO, Mr. Ryan Drexler, and MusclePharm's outside counsel located in New York in compliance with the notice provisions in the parties' Agreement. This letter, which detailed the facts and circumstances that form the basis of JMAN2's causes of action, was delivered to MusclePharm on April 12, 2017. Delivery was confirmed by the signature of "B. Romero," a MusclePharm employee. MusclePharm never responded to JMAN2's demand.

12.     Nevertheless, despite repeated and futile attempts to contact MusclePharm representatives through every phone number listed on MusclePharm's website or in the parties' Agreement, JMAN2 sent a second demand letter to MusclePharm on May 3, 2017. To avoid any

doubt or uncertainty, JMAN2 sent the second letter to every executive officer and member of MusclePharm's Board of Directors ("BOD"), who were listed in MusclePharm's Form 10K, filed with the U.S. Securities and Exchange Commission ("SEC") on May 1, 2017: (i) Mr. Ryan Drexler, Chief Executive Officer, President and Chairman of the BOD; (ii) Mr. Brian Casutto, Executive Vice President of Sales and Operations; (iii) Mr. Douglas West, Vice President of Finance and Administration, Interim Principal Financial Officer and Interim Principal Accounting Officer; (iv) Mr. Michael Doron, BOD Member; and (v) Mr. William Bush, BOD Member. And, JMAN2 again faxed the second letter, along with all of its attachments, to MusclePharm at the fax number set forth in the parties' Agreement. Months have passed, and none of MusclePharm's agents, representatives, executives or BOD members have made any effort—much less, a "good faith" effort—to resolve this dispute or even respond to JMAN2.

13. Based on MusclePharm's deliberate disregard of JMAN2's good faith efforts to resolve this matter prior to filing suit—a characteristic MusclePharm has displayed repeatedly and indiscriminately in its business dealings—JMAN2 has exhausted all good faith efforts to resolve this matter. Clearly, "good faith" dispute resolution is no longer possible. *See* Ex. 1 at ¶22. To finally hold MusclePharm accountable for promises it made in July of 2014, JMAN2 has appropriately complied with every conceivable condition precedent in the Agreement and is now exercising its right to "resort to litigation in a court of competent jurisdiction in Denver County, Colorado." *Id.*

## FACTUAL ALLEGATIONS AND CLAIMS

**A.    MusclePharm's Business**

14.    MusclePharm is a Denver-based organization, which describes itself as a performance lifestyle company that develops, markets and distributes branded nutritional products and supplements for athletes and fitness enthusiasts.

15.    Today, MusclePharm wholly owns operating subsidiaries in Canada, Ireland and Australia. Its products are sold in more than 120 countries and available in over 50,000 retail outlets globally. The Company touts its Sports Science Institute, located at its Denver headquarters, as a state-of-the-art, 30,000 square-foot professional training and performance facility that houses an in-house gym, an indoor football field, an Ultimate Fighting Championship ("UFC") mixed martial arts ring and a basketball court. Its brand owns over 51 registered trademarks in the U.S., as well as registered trademarks in at least 16 other countries. For the year ended December 31, 2016, MusclePharm reported revenues of over $132,000,000.00.

16.    But, this was not always the case. MusclePharm's founder, Bradley J. Pyatt, created MusclePharm in 2008, months after Mr. Pyatt had filed for bankruptcy with more than $1,000,000.00 in debt following a failed business venture in a penny stock company that sold canned energy drinks. To create the Company, Mr. Pyatt acquired another penny stock fitness company named "Tone in Twenty," which had been incorporated in the State of Nevada in August 2006. As of August 31, 2009, Tone in Twenty reported it had $2,013 in cash and cash equivalents and sold its products exclusively in a few "The Vitamin Shoppes" outlet stores.

17.     After officially changing its name to MusclePharm in 2010, the Company

described its primary business focus to be the implementation of a marketing strategy that

created branding opportunities through sponsorships and endorsements of professional athletes

that would expand the Company's business and increase consumer awareness of its brand:

> Our core marketing strategy is to brand MusclePharm as the "must have"
> nutritional supplement line for high performance athletes. We want to be known
> as the athlete's company, run by athletes with products for athletes. We have
> endorsements from over 50 UFC fighters, several well-known NFL players, as
> well as top X-Game and fitness athletes. Athletes are considered role models and
> many people strive to emulate their fitness and well-being regimen. The objective
> of these athletic endorsements is to build both consumer awareness and
> confidence and to drive consumer demand for our products in the market.

18.     MusclePharm first implemented this strategy by signing endorsement and

sponsorship agreements with dozens of UFC fighters. For example, Mr. Pyatt paid UFC fighter

Mike Bisping $17,500.00 to wear the MusclePharm logo on his rear in a UFC event, UFC fighter

Clay Guida $6,500.00 per fight to wear the Company's logo on his crotch and UFC fighter Alan

Belcher $18,000.00 to display the Company's logo on his shirt, crotch and rear during a UFC

event. And, Mr. Pyatt committed approximately $800,000.00 to a sponsorship deal with World

Extreme Cagefighting, a UFC subsidiary.

19.     As MusclePharm carried out its endorsement-marketing strategy and issued more

and more shares to penny stock investors, the Company's sales skyrocketed, reaching

$17,000,000.00 in 2011.

20.     That fall, MusclePharm entered an agreement to become the UFC's official

supplement supplier at a cost of approximately $4,000,000.00 over two years to the Company.

21.     Around the same time, MusclePharm entered an endorsement agreement with

National Football League ("NFL") quarterback Michael Vick, who had recently been released

from prison for running a dogfighting ring, which obliged the Company to pay Mr. Vick approximately $1,500,000.00.

22.     As the Company continued to expand, the endorsement-marketing strategy and focus was paying off. MusclePharm continued its devotion to the strategy over the years, committing the Company to endorsement agreements with numerous other professional athletes, including NFL player Collin Kaepernick and UFC mixed martial artists, Anderson Silva, Jon "Bones" Jones and Quinton "Rampage" Jackson.

23.     For example, in 2013, MusclePharm entered a sponsorship agreement with Arnold Schwarzenegger, which obliged the Company to pay Mr. Schwarzenegger approximately $8,500,000.00 in cash, stock options and royalties.

24.     Then, in 2014, MusclePharm agreed to pay professional golfer Tiger Woods, who recently had been dropped by other sponsors like Gillette, Gatorade and AT&T due to allegations surrounding a sex scandal, approximately $5,000,000.00 in cash and stock options to place the Company's logo on Mr. Woods' golf bag.

25.     By the summer of 2014, MusclePharm was executing its endorsement-marketing strategy surgically and persistently by promising large sums of money to high-profile athletes in exchange for these athletes' endorsement and sponsorship of MusclePharm's business and products. MusclePharm was reaping the benefits of these sponsorships, reporting over $177,000,000.00 in gross sales revenue for 2014—an exponential increase from where the Company had begun only six years earlier. And, MusclePharm's stock value had climbed from only pennies to consistently trading at more than $12.00 per share by July 2014.

**B.      The Agreement Between MusclePharm and JMAN2**

26.     Consistent with its objective to pay high-profile athletes to endorse its products, MusclePharm proposed the Agreement to JMAN2 in 2014, which the parties entered on July 15, 2014. *See* Ex. 1.

27.     The Agreement had a three-year term expiring on July 15, 2017.

28.     Under the Agreement, JMAN2 licensed to MusclePharm the right to use Endorser's name, reputation, likeness, voice, signature and appearance to endorse, advertise and promote MusclePharm's business and products.

29.     To induce JMAN2 to enter into the Agreement and in consideration for the license JMAN2 granted to MusclePharm, the Company granted JMAN2 five-year warrants to purchase 100,000 shares of MusclePharm restricted stock and promised to pay JMAN2 $1,000,000.00 (the "Fee") in cash through periodic installment payments: (i) $250,000 in the First Contract Year (July 15, 2014 to July 15, 2015); (ii) $350,000 in the Second Contract Year (July 15, 2015 to July 15, 2016); and (iii) $400,000 in the Third Contract Year (July 15, 2016 to July 15, 2017).

30.     Specifically, the Agreement required and MusclePharm contracted to make scheduled payments to JMAN2 in the following installments:

- $62,5000 on each of the following dates: July 21, 2014, September 15, 2014, December 15, 2014, and March 15, 2015;
- $87,500 on each of the following dates: July 15, 2015, September 15, 2015, December 15, 2015, and March 15, 2016; and
- $100,000 on each of the following dates: July 15, 2016, September 15, 2016, December 15, 2016, and March 15, 2017.

31.     Despite the mandatory nature of the installment compensation structure the parties bargained for in the Agreement, and despite JMAN2's performance of its required services under

the Agreement that MusclePharm knowingly accepted, MusclePharm never paid JMAN2 one cent of the Fee it promised under the Agreement.

## C.    JMAN2 Fully Performed Under the Agreement

32.    Over the year and a half following execution of the Agreement, JMAN2 fully performed its obligations and MusclePharm reaped the benefits of its bargain: Endorser's endorsement of MusclePharm products and services.

33.    Moreover, throughout this time period, MusclePharm confirmed the validity and binding nature of the Agreement and invoked the terms of the Agreement to demand JMAN2's performance on several occasions.

34.    For example, in July of 2015, MusclePharm's marketing agents invoked the terms of the Agreement to have Endorser personally attend and participate in MusclePharm's 3D ("Desire. Discipline. Dedication") Youth Football Camp in Denver, Colorado, from July 10-12, 2015.

35.    MusclePharm's most senior-level executives, including Mr. Pyatt, actively induced JMAN2's performance under the Agreement by setting up numerous photograph, production and video "shoots," wherein Endorser endorsed MusclePharm's business and products.

36.    Despite JMAN2's continued performance under the Agreement and MusclePharm's continued acceptance and inducement of JMAN2's performance under the Agreement, MusclePharm persistently failed to make any of the mandatory installment payments owed to JMAN2 through the fall of 2015.

37.     Specifically, although required under the Agreement, MusclePharm failed to pay JMAN2 the following Installment Payments before MusclePharm unilaterally terminated the Agreement:

- $62,500.00 on July 21, 2014;
- $62,500.00 on September 15, 2014;
- $62,500.00 on December 15, 2014;
- $62,500.00 on March 15, 2015;
- $87,500.00 on July 15, 2015; and
- $87,500.00 on September 15, 2015.

38.     To this day, MusclePharm has not paid JMAN2 these funds as promised.

**D.     MusclePharm Terminated the Agreement as Part of a Cost-Cutting Initiative Adopted to Salvage Its Hemorrhaging Stock Price**

39.     In August 2015, MusclePharm reversed course on the endorsement-marketing strategy it had been so devoted to during the Company's rise.

40.     Specifically, on the heels of the announcement of an SEC investigation into the Company, which revealed MusclePharm had failed to disclose exorbitant payments of approximately $500,000.00 to its executives for non-business expenses, such as personal golf club memberships, trips to Mexico and the use of private planes, as well as other improper financial accounting and disclosures, MusclePharm's stock price had fallen precipitously to approximately $4.00 per share in August 2015.

41.     According to MusclePharm's sworn statements to the SEC and its shareholders, on August 24, 2015, MusclePharm's BOD "approved a restructuring plan for the Company" that "was designed to reduce costs and to better align the Company's resources for profitable growth."

42.   A key component of the Company's strategic initiative to cut costs was "the Company['s] renegotiati[on] or terminati[on of] a number of contracts with endorsers in a strategic shift away from such arrangements and towards more grass-roots marketing and advertising efforts."

43.   In its sworn public filings, the Company explained this cost-cutting strategy as follows: "To facilitate our strategic shift toward more cost-effective marketing and advertising efforts, we renegotiated or terminated a significant amount of our contracts with endorsers and sponsors. We anticipate savings of greater than $25 million over what would have been the life of these contracts."

44.   In a letter from MusclePharm's new Chairman of the Board, Mr. Drexler, to its shareholders, the Company explained this cost-cutting strategy as follows:

> We have applied the same scrutiny to our sponsorship and endorsement agreements with athletes, celebrities, and sporting organizations. While we believe that our old model of agreements with these partners helped to boost our credibility by increasing exposure to our brand, we also need to be mindful of the costs associated with these arrangements as compared to the return on investment. Although these investments have helped build our brand, and we will continue to spend on traditional sponsorships and endorsements, we want to be strategic and targeted about these relationships. As a result, we are reducing reliance on certain costly arrangements in favor of traditional channel efforts.

45.   Shortly after the Company's BOD approved this "strategic shift" to terminate the endorsement and sponsorship agreements that had been the foundation of MusclePharm's rise over the years, the Company—without ever having paid JMAN2 any of the installment payments owed under the Agreement and despite JMAN2's full performance of its contractual obligations—unjustifiably and baselessly terminated the Agreement with JMAN2 in the fall of 2015.

46. The Agreement specifically identified what would occur if MusclePharm elected to terminate the Agreement: if JMAN2 had "performed all services required by this Agreement, then upon such termination, MusclePharm shall pay the full Fee (or any remaining balance thereof)." JMAN2 had fully performed the services required by the Agreement. But, MusclePharm never paid JMAN2 a cent—neither the Installment Payments due prior to MusclePharm's termination, nor the "full Fee" due as a result of MusclePharm's termination.

47. All told, in October 2016, *Bloomberg Businessweek* reported that MusclePharm's cost-cutting initiative had resulted in the Company reducing its sponsorship commitments from $59,000,000.00 to approximately $8,000,000.00.

**E.    JMAN2 Was Not the Only Victim of MusclePharm's Broken Promises**

48. JMAN2 was not the only victim of MusclePharm's corporate decision to cut costs by skirting its obligations under its agreements. Indeed, MusclePharm's corporate willingness to break its promises to try and improve its bottom line is no secret, as demonstrated by the effect MusclePharm's "cost-cutting" initiative had on its other business partners.

49. Following MusclePharm's decision to "renegotiate" or "terminate" its endorsement agreements, the Company paid Tiger Woods approximately $2,500,000.00 to settle Mr. Woods' claims that the Company improperly withheld installment payments owed to Mr. Woods and breached his endorsement agreement with MusclePharm.

50. The Company paid approximately $3,000,000.00 to settle claims by Arnold Schwarzenegger that the Company (i) breached the endorsement agreement with Mr. Schwarzenegger, and (ii) misappropriated Mr. Schwarzenegger's name and likeness.

51.     In August 2016, the City Football Group Limited, which owns the Manchester City Football Group, commenced arbitration proceedings against MusclePharm, alleging it had breached the parties' sponsorship agreement by not paying more than $8,000,000.00 owed under the agreement.

52.     MusclePharm's decision to breach its agreements was not limited to its endorsers and sponsors. MusclePharm also chose to not to honor its agreements with other businesses that had entered supply and manufacture agreements with the Company.

53.     For example, Capstone Nutrition filed a lawsuit against MusclePharm, alleging MusclePharm owed it over $22.5 million in accounts receivable plus contractual interest and continually ignored its obligation to make installment payments under its agreement. MusclePharm later settled the Capstone dispute with a payment of approximately $11,000,000.00 in cash and more than one million MusclePharm shares. And, in January 2016, another supplier, ThermoLife International LLC, filed a lawsuit alleging effectively the same thing—that MusclePharm failed to meet its minimum payment requirements and breached the parties' agreement.

54.     In the end, MusclePharm made a corporate decision to breach its contractual obligations to a number of its business partners, including JMAN2.

55.     At minimum, MusclePharm breached the Agreement with JMAN2 by failing to pay the minimum Installment Payments that undoubtedly were due prior to MusclePharm's termination of the Agreement.

56.     Despite reaping the benefits of its bargain through JMAN2's performance under the Agreement, MusclePharm wholly deprived JMAN2 of any benefit whatsoever from the Agreement—much less the consideration owed and for which JMAN2 entered the Agreement.

57.     For MusclePharm's calculated scheme to prevent JMAN2 from realizing the benefit of its bargain under the Agreement, JMAN2 brings this Complaint to recover the $425,000.00 in mandatory Installment Payments that MusclePharm still owes under the Agreement.

## FIRST CLAIM FOR RELIEF[1]
### (Breach of Contract)

58.     Each of the facts alleged above and below is incorporated by reference as if fully set forth herein.

59.     JMAN2 entered a valid and binding contract with MusclePharm—the Agreement. *See* Ex. 1.

60.     JMAN2 fully performed JMAN2's obligations under the Agreement, and MusclePharm repeatedly invoked the terms of the Agreements in order to induce JMAN2's performance.

61.     MusclePharm accepted JMAN2's performance under the Agreement and, on numerous occasions, affirmed, confirmed and ratified the validity and binding nature of the Agreement by inducing and accepting JMAN2's performance under the Agreement.

62.     MusclePharm breached the Agreement.

---

[1] Under the choice of law provision in the Agreement, the interpretation, validity and performance of the Agreement is to "be construed and enforced in accordance with the laws of the State of New York." Ex. 1 at ¶21.

63. MusclePharm breached the Agreement by failing to make the following required Installment Payments to JMAN2, despite JMAN2's full performance under the Agreement and the Company's acceptance of such performance:

- $62,500.00 on July 21, 2014;
- $62,500.00 on September 15, 2014;
- $62,500.00 on December 15, 2014;
- $62,500.00 on March 15, 2015;
- $87,500.00 on July 15, 2015; and
- $87,500.00 on September 15, 2015.

64. MusclePharm's breach of the Agreement caused damage to JMAN2 by depriving JMAN2 of the consideration promised and owed to JMAN2 under the Agreement.

65. MusclePharm's breach of the Agreement further caused special damages to JMAN2, including the need to litigate this action, despite the parties' Agreement to seek in good faith agreeable dispute resolution proceedings. Thus, MusclePharm's breach caused JMAN2 to incur special damages, including, but not limited to, attorneys' fees and litigation costs.

## SECOND CLAIM FOR RELIEF
### (Unjust Enrichment)

66. Each of the facts alleged above and below is incorporated by reference as if fully set forth herein. JMAN2 asserts a claim for unjust enrichment independently of and in the alternative to JMAN2's other claim asserted herein.

67. JMAN2 has been damaged and MusclePharm has been unjustly enriched as a result of JMAN2's endorsement of MusclePharm's business, products and services.

68. MusclePharm has been unjustly enriched by benefitting from the retention and use of money that rightfully should have been paid to JMAN2 as consideration for JMAN2's endorsement of MusclePharm's business, products and services.

## DEMAND FOR TRIAL BY JURY

JMAN2 expressly and specifically demands a jury trial to determine the facts, claims and causes of actions alleged herein.

## PRAYER FOR RELIEF

**WHEREFORE**, JMAN2 respectfully seeks judgment from this Court for damages as alleged herein against MusclePharm comprised of: (i) damages based on each of the facts and claims alleged herein, including actual, general, special and consequential damages; (ii) interest; (iii) attorneys' fees; (iv) expert and litigation costs; and (v) court costs.

DATED April 17th, 2018.

/s/ Valeri S. Pappas
Valeri S. Pappas #29939
Jennifer A. Tiedeken, #42674
DAVIS & CERIANI, P.C.
1600 Stout Street, Suite 1710
Denver, Colorado 80202
Tel: (303) 534-9000
Fax: (303)534-4618
vpappas@davisandceriani.com
jtiedeken@davisandceriani.com

/s/ Cody L. Hill
Bradley E. Beckworth (*pro hac vice forthcoming*)
Jeffrey J. Angelovich (*pro hac vice forthcoming*)
Cody L. Hill (*pro hac vice forthcoming*)
NIX, PATTERSON & ROACH, LLP
3600B N. Capital of Texas Hwy., Suite 350
Austin, TX 78746
Tel: (512) 328-5333
Fax: (512) 328-5332
jangelovich@nixlaw.com
bbeckworth@nixlaw.com
codyhill@nixlaw.com

**ATTORNEYS FOR PLAINTIFF**

DATE FILED: April 17, 2018 2:29 PM
FILING ID: 6597290B6655B
CASE NUMBER: 2018CV31358

# EXHIBIT 1



## ENDORSEMENT AGREEMENT

THIS AGREEMENT is entered into as of July 15, 2014 by and between JMAN2 General III, LP ("Contractor") for the services of Jonathan P. Manziel, ("Endorser") and MusclePharm Corporation with its principal place of business in Denver, Colorado, and its affiliated entities ("MusclePharm" or the "Company").

## RECITALS

Whereas, MusclePharm is engaged in the business of developing and marketing nutritional products for athletes and fitness enthusiasts, and

Whereas, the full range of MusclePharm's nutritional products and dietary supplements, with the exclusion of (i) MusclePharm's Arnold Schwarzenegger Series products, and (ii) MusclePharm's FitMiss brand products, shall be referred to as "Products", and

Whereas, MusclePharm from time to time uses consumer, celebrity, and expert endorsements or testimonials to promote the Products in marketing and advertising materials, and

Whereas, MusclePharm desires to engage Endorser, and Contractor desires to accept the exclusive engagement, as more fully described in this Agreement, whereby Contractor will license Company the right to use Endorser's name, reputation, and appearance to endorse and promote MusclePharm and its Products on the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the mutual promises and agreements set forth below, the parties agree as follows:

1.    *Term:* This Agreement shall have a term of three (3) years, commencing on July 15, 2014 and shall expire on July 15, 2017 (the "Term"), unless otherwise terminated earlier as permitted herein. Each year of the Term may be referred to generally as a "Contract Year". The period from July 15, 2014 to July 15, 2015 shall be referred to as the "First Contract Year". The period from July 15, 2015 to July 15, 2016 shall be referred to as the "Second Contract Year". The period from July 15, 2016 to July 15, 2017 shall be referred to as the "Third Contract Year".

2.    *Engagement:* MusclePharm hereby engages Contractor and Contractor promises and agrees to make Endorser available to use, evaluate, advertise and promote the Products, as may be requested by MusclePharm. Contractor also agrees to the use, during the Term, of Endorser's name, approved photograph, approved appearance, approved likeness, reputation, approved voice, approved signature and other identifying characteristics, as more fully described below (Endorser's name, photograph, appearance, likeness, reputation, voice, signature and other identifying characteristics appearance, shall be referred to as the "Name and Appearance") to advertise and promote the business of MusclePharm and its Products as more fully set forth herein.

1

3.  *Endorsement of Products:* Contractor agrees that it will cause Endorser to, and Endorser shall, use and evaluate the Products according to the recommended use and dose guidelines. Based on Endorser's knowledge, personal use and experience with the Products he shall from time to time during the Term of this Agreement provide his honest evaluation, opinion, and findings about the Products he is endorsing and promoting. The endorsements must be based on Endorser's knowledge and/or personal use and experience with the Products at or about the times the endorsements are made. Subject to Contractor's prior written approval (such approval not to be unreasonably withheld or delayed), Endorser's statements and endorsements, or paraphrases thereof, may be used by MusclePharm to advertise, promote and publicize its business and Products as provided herein. Endorser's endorsements of the Products will be in accordance with the guidelines established by the Federal Trade Commission for endorsements in advertising. If requested by MusclePharm, Endorser shall provide a signed affidavit in form satisfactory to MusclePharm confirming Endorser's compliance with the FTC standards in connection with his endorsements and endorsement activities.

MusclePharm will use Endorser's Name and Appearance solely in association with the Products. This limitation applies to endorsement of Products as well as to the Right of Publicity set forth at Paragraph 7 below.

4.  *Advertising and Promotional Activities:* During the Term of this Agreement Contractor agrees to cause Endorser to perform the following advertising and promotional services for MusclePharm and to grant the following grant of rights:

(a)     Subject to Endorser's prior approval (such approval not to be unreasonably withheld or delayed), as more fully set forth herein, Contractor agrees that MusclePharm shall have the unlimited right to use, worldwide, Endorser's Name and Appearance to advertise MusclePharm and its Products in print media, and in all other forms of media including, but not limited to, point of sale material, direct marketing material, and radio, television, electronic, and computer media (including but not limited to MusclePharm's Internet and social media websites), but not as a premium or novelty. In the event Endorser appears in television commercials promoting MusclePharm and its Product during the Term hereof, then for the purpose of computing health and welfare benefit contributions and any other payments under any SAG or AFTRA contracts applicable to Endorser's appearance in such television commercials, 25% of the compensation payable to Endorser under this Agreement shall be allocated as fair and reasonable consideration for Endorser's work and appearance in such television commercials broadcast during the Term.

During the Term, and subject to Endorser's prior approval as more fully set forth herein (such approval not to be unreasonably withheld or delayed), MusclePharm also shall have the unlimited right to use, worldwide, Endorser's oral or written endorsements of Products, or paraphrases thereof, to promote MusclePharm and the Products. MusclePharm will not be in breach of this Agreement if third parties (e.g., retailers who sell the Products) continue to use Endorser's Name and Appearance granted to MusclePharm in this section utilizing only materials created before the expiration date of this Agreement in the manner set forth in this Agreement for up to six (6) months beyond the expiration of this Agreement (the "Use-up Period"); provided that MusclePharm shall use all reasonable efforts to notify such third parties of the expiration of the Term and to cause such third parties to cease such use at the end of the Term, or as early in the Use-up Period as possible.

(b)     During the Term, Endorser will provide a reasonable amount of promotion of MusclePharm and the Products via his personal website (to the extent Endorser maintains a personal website), and social media outlets (e.g. Facebook, Twitter and any future social media outlets used by Endorser or websites of the endorser; hereinafter collectively "Social Media"). MusclePharm shall have

2

the right to directly contact Endorser's Social Media representatives for purposes of working collaboratively to develop mutually approved statements for use on Endorser's Social Media sites. To the extent Endorser maintains a personal website during the Term, Endorser shall provide a prominently placed link to musclepharm.com and any additional MusclePharm websites as may be requested by MusclePharm from time to time. During the Term, Endorser shall be a follower of MusclePharm on Twitter and "Like" MusclePharm on Facebook. Endorser shall identify himself as a "MusclePharm Athlete" on his Social Media platforms.

Solely if created during the Production Days or Appearances (at Company's sole cost and expense), and subject to Endorser's prior approval thereof, Endorser will provide online content for MusclePharm's websites and social media websites (the "On-Line Content). This will be in a form agreed to by the parties (e.g. training video or video interview with a MusclePharm representative).

(c)     Solely during one of the Production Days or Appearances, on a one-time basis, Endorser will interview with a designated representative from MusclePharm for purposes of preparing an article about Endorser for publication in print media "advertorial" format (e.g. multi-page print or web format ad) or other reasonable format designated by MusclePharm (the "Article").

(d)     During the Term of this Agreement, Endorser shall exercise his good faith reasonable efforts to promote MusclePharm and its Products, where appropriate (as determined in Endorser's good faith reasonable discretion) in connection with print, television, radio or online interviews granted by Endorser, it being agreed that Endorser's failure to do so shall not be deemed a breach of this Agreement. For the avoidance of doubt, this specifically excludes wearing MusclePharm apparel. To the extent permitted by the NFL and/or Endorser's then-current team, Endorser shall display MusclePharm Products in his locker.

(e)     During the Term of this Agreement, Contractor shall cause Endorser to participate in a total of two (2) personal appearances ("Appearances") or photo/video sessions ("Production Days") per year (i.e., a total combined aggregate six (6) Appearances/Production Days during the Term). Appearances may be up to a maximum of four (4) hours in duration, not including travel time to and from the Appearance, as scheduled by MusclePharm, for the purpose or promoting MusclePharm and its Products, subject to Endorser's prior approval of the dates, times and locations of the Appearances, the nature of the Appearance, the proposed talking and message points, if any, and such other information as Endorser may reasonably request. Production Days shall be for the purpose of MusclePharm obtaining a sufficient number of acceptable photographs and/or video footage of Endorser for the editorial and commercial uses intended by MusclePharm pursuant to this Agreement, including any commercials, On-Line Content, or the Article. The dates, times and locations of the Production Days shall be subject to Endorser's prior approval (such approval not to be unreasonably withheld or delayed). Each Production Day may be up to a maximum eight (8) hours in duration.

(f)     Endorser may make additional personal appearances, at the request of MusclePharm, but the parties agree that Endorser shall have no specific duty or obligation to make more appearances, and that doing so will be a gesture of goodwill on the part of Endorser with compensation, if any, to be determined prior to Endorser making the additional appearances. Endorser may accept or decline any such additional personal appearances in Endorser's discretion.

(g)     During the Term of this Agreement, Endorser shall provide MusclePharm with (i) three (3) testimonials per Contract Year endorsing MusclePharm Products, with such testimonials, and the use thereof, subject to written approval of Endorser; (ii) one (1) statement or endorsement in support of MusclePharm's Science & Research Institute, with such statement or endorsement, and the use thereof, subject to the prior written approval of Endorser; and (iii) fifty (50) autographed items per Contract Year

3

at no cost (other than for certification as described below) for use in MusclePharm's promotional activities and/or for charity or charity auctions or similar charitable use (but not otherwise for sale to the public), the items to be autographed to be provided at Company's sole cost and expense. MusclePharm shall obtain verification from Panini America, Inc. ("Panini") with respect to all signatures in accordance with Panini's process therefor at MusclePharm's sole cost and expense with respect to the certification process (but no additional consideration will be paid to Contractor or Endorser or Panini for Endorser's autograph on such items).

(h)    Contractor expressly represents and warrants that Endorser is not subject to any restriction or limitation by way of employment or contractual obligation that may impair or limit his performance of the advertising and promotional activities described above.

5.    *Exclusivity; Right of First Refusal*: During the Term of this Agreement, Endorser shall exclusively endorse the Products of MusclePharm as it relates to the following product categories: vitamins and minerals, fat loss products, muscle builders, protein based products, electrolytes and amino acids, powders, pills, bars, gels and ready-to-drink products (collectively, the "Exclusive Product Categories"), with the exception of (i) sports beverages, and (ii) energy drinks ((i) and (ii), together, the "Excluded Products").

Should Endorser receive an expression of interest (an "Expression of Interest") from a third party (the "Offeror") to endorse such Offeror's products in the product categories of the Excluded Products, which Endorser in good faith desires to entertain, then promptly after receipt of such Expression of Interest, Contractor shall give written notice to such effect to MusclePharm, setting forth its desire to entertain such a negotiation. MusclePharm shall have a period of fifteen (15) days from receipt of the notice of the Expression of Interest to negotiate in good faith with Contractor for an endorsement by Endorser with respect to Excluded Products produced by MusclePharm (the "Negotiation Period"). If MusclePharm chooses not to engage in negotiations with Endorser for the Excluded Products after receipt of such notice, Contractor and Endorser shall be free to enter into negotiations and an agreement with an Offeror, or any other third party, with respect to the Excluded Products with no further obligation to MusclePharm whatsoever. If MusclePharm negotiates with Contractor during the Negotiation Period, but no agreement is reached, Endorser shall be free to enter into negotiations and an agreement with an Offeror or any other third party, with respect to the Excluded Products with no further obligation to MusclePharm, it being agreed that if the offer Contractor desires to accept from the Offeror or other such third party is equal to or less valuable to Contractor than the last offer to Contractor by MusclePharm, MusclePharm shall have the option to match the material terms of such offer within five (5) days of notice thereof by Contractor. If MusclePharm matches such terms, the parties will enter into an agreement (or amendment to this Agreement) reflecting such terms. If MusclePharm opts not to match such terms, Contractor and Endorser shall be free to enter into an agreement with an Offeror or any other third party with respect to the Excluded Products with no further obligation to MusclePharm.

Further, if Contractor and Endorser have not otherwise received an Expression of Interest during the Term with respect to Excluded Products in accordance with the foregoing, and during the Term MusclePharm desires to expand the Exclusive Product Categories to include the Excluded Products, MusclePharm shall provide Contractor with a written offer for the same (including details as to the monies being offered for such expansion) and Contractor and MusclePharm shall negotiate in good faith for a period not to exceed fifteen (15) days from the date of such offer letter. If no agreement is reached at the end of such period, Endorser shall be free to enter into agreements with third parties for the Excluded Products with no further obligation to MusclePharm whatsoever, it being agreed that if the offer Contractor desires to accept from such third party is equal to or less valuable to Contractor than the last offer to Contractor by MusclePharm, MusclePharm shall have the option to match the material terms of such third party offer. If MusclePharm opts not to match such terms within five (5) business day of receipt thereof, Contractor

356155.7
070714

and Endorser shall be free to enter into an agreement with a third party with respect to the Excluded Products with no further obligation to MusclePharm.

6.      *Scheduling*: All Production Days, the Appearances and any other advertising and promotional activities requested by MusclePharm as permitted in this Agreement shall be scheduled by mutual agreement and with due consideration for Endorser's other business activities and commitments occurring during the Term of this Agreement, including Endorser's obligations to the NFL. To the greatest extent practicable, Endorser's commitments pursuant to this Agreement shall be scheduled during the off-season for professional football. Endorser agrees that he will in good faith make every reasonable effort, given his other commitments, to give priority to the fulfillment of his obligations pursuant to this Agreement. The parties shall confer periodically for the purpose of coordinating and scheduling Endorser's advertising and promotional activities and services.

7.      *Right of Publicity*: As provided above and below, Contractor expressly grants to MusclePharm the right to use the Name and Appearance for the period of time and for the purposes set forth in this Agreement. The rights Endorser grants to MusclePharm to use Endorser's Name and Appearance will be referred to as the "Right of Publicity" or the "Rights to Publicize."

      (a)      During the Term of this Agreement, and subject to Endorser's approval rights as set forth herein (such approval not to be unreasonably withheld or delayed), Endorser grants to MusclePharm and consents to MusclePharm's unlimited commercial use of Endorser's Name and Appearance, and the Rights to Publicize Endorser's Name and Appearance, in MusclePharm's sole discretion, to advertise, promote, endorse and publicize MusclePharm and the Products, worldwide in any media selected by MusclePharm, including but not limited to print, radio, television, electronic, telephone, wireless or internet.

      (b)      Subject to Endorser's approval rights as set forth herein (such approval not to be unreasonably withheld or delayed), MusclePharm may in its sole discretion exercise some or all of the rights granted by Endorser in this Agreement, but MusclePharm shall in any event, remain obligated to pay the entire Fee. If MusclePharm elects to not exercise or use all the rights granted by Endorser, MusclePharm's election shall not be interpreted or construed as a waiver or release of such rights. MusclePharm shall have the rights to use Endorser's Name and Appearance and the Right to Publicize Endorser's Name and Appearance, as provided in this Agreement, unless Endorser and MusclePharm enter into a separate written agreement in which MusclePharm waives or releases some or all of the rights Endorser has granted in this Agreement.

8.      Compensation: As compensation for the endorsements and testimonials given by Endorser, and for his advertising and promotional activities, and for the right to publicize Endorser's Name and Appearance, MusclePharm shall compensate Contractor as follows:

      (a)      Cash: During the Term of this Agreement, MusclePharm shall pay Contractor (i) $250,000 in the First Contract Year, (ii) $350,000 in the Second Contract Year, and (iii) $400,000 in the Third Contract Year (for a total of $1,000,000) (collectively, the "Fee"). Payments shall be made in installments as follows:

$62,500 payable on each of the following dates:

- July 21, 2014
- September 15, 2014
- December 15, 2014

- March 15, 2015

$87,500 payable on each of the following dates:

- July 15, 2015
- September 15, 2015
- December 15, 2015
- March 15, 2016

$100,000 payable on each of the following dates:

- July 15, 2016
- September 15, 2016
- December 15, 2016
- March 15, 2017

    (b)      Stock: On the date hereof, MusclePharm and Contractor agreed that MusclePharm would, on such date, grant Contractor five (5) year warrants that shall vest in equal monthly installments over the first twenty-four (24) months of the Term to purchase 100,000 shares of MusclePharm restricted stock ("Warrants") for services to be performed hereunder. MusclePharm, on or before the date hereof, had obtained all requisite approvals to grant Contractor the Warrants. The exercise price of the Warrants the closing price as of the date hereof. The Warrants are issued in compliance with all SEC rules and regulations. The Warrants are in the form attached hereto as **Exhibit A**.

    (c)      During the Term, MusclePharm also shall supply Products for Endorser's personal use and endorsement as contemplated by this Agreement in an amount equal to $500 in value per month.

9.    Contractor Representations: In connection with the issuance of the Warrants pursuant to Section 8(b), above, Contractor hereby makes the following additional representations to MusclePharm:

    (a)      Contractor understands that, as of the date hereof, none of the shares to be issued upon the exercise of the Warrants to be issued pursuant to this Agreement (the "Shares", and together with the Warrants, collectively, the "Securities") have been registered under the Securities Act of 1933, as amended ("Securities Act"), by reason of a specific exemption from the registration provisions of the Securities Act, the availability of which depends upon, among other things, the bona fide nature of the investment intent of Contractor and the accuracy of Contractor's representations as expressed herein. Contractor is acquiring all of the Securities for its own account, not as a nominee or agent, for investment and not with a view to, or for resale in connection with, any distribution or public offering thereof within the meaning of the Securities Act.

    (b)      Contractor understands that the Securities granted pursuant to this Agreement will constitute "restricted securities" under the federal securities laws, inasmuch as they will be acquired from MusclePharm in a transaction not involving a public offering and that, under such laws, such Securities may not be resold without registration under the Securities Act or an exemption therefrom. The certificates representing such Securities will be endorsed with a legend to such effect. Contractor understands that (x) there are substantial restrictions on the transferability of the Securities, and (y) no federal or state agency has made any finding or determination as to the fairness of investment in, or any recommendation or endorsement of such Securities.

356155.7
070714

(c)      Contractor, together with Contractor's business and financial advisors,  have such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of its acceptance of the shares as compensation hereunder.

(d)      Contractor is an "accredited investor" within the meaning of Rule 501 of Regulation D promulgated under the Securities Act.

(e)      Contractor understands that all books, records, and documents of MusclePharm have been and remain available for inspection by it or its business and financial advisors upon reasonable notice.  Contractor and its professional advisors have had the opportunity to ask questions and receive answers from MusclePharm concerning the terms and conditions of the offer of the shares to Contractor hereunder. Contractor believes that it or such advisors have obtained sufficient information to evaluate the merits and risks of receipt of shares as compensation hereunder.  Contractor confirms that it has had the opportunity to obtain such independent legal, tax and financial planning advice it has deemed appropriate prior to making a decision to enter this Agreement.  In making such decision, Contractor has relied upon such independent investigations as it has deemed appropriate, and upon information provided by MusclePharm to Contractor and its advisors and representatives or found in the books, records, or documents of MusclePharm.

(f)      Contractor is aware that the economic ownership of the  Securities is highly speculative and subject to substantial risks.  Contractor is capable of bearing the high degree of economic risk of the acceptance of the MusclePharm shares as compensation hereunder, including, but not limited to, the possibility of a complete loss of value of the Securities, the lack of a sustained and orderly public market for shares of MusclePharm common stock and, until a Registration Statement shall have been declared effective, limited transferability of the Securities, which may make the liquidation thereof difficult to accomplish in a timely manner.

10.      *Termination:*  This Agreement may be terminated by either party at any time upon mutual agreement in writing; or upon a material breach or default of this Agreement; or upon the death, disability or incapacity of Endorser as follows:

(a)      In the event either party desires to terminate this Agreement because of a material breach or default by the other party, the party seeking to terminate shall give written notice of intent to terminate to the other party, and in such notice shall set forth in reasonable detail the facts, circumstances or events causing the alleged breach or default ("Events of Default").  The party in default shall have thirty (30) days from receipt of such notice in which to cure the Events of Default to the reasonable and objective satisfaction of the terminating party (the "Cure Period").  If the party in default fails, refuses or is unable for any reason to cure the Events of Default to the reasonable and objective satisfaction of the terminating party during the Cure Period, then this Agreement shall be automatically terminated at the end of the Cure Period, unless the terminating party agrees otherwise.

(b)      This Agreement may also be terminated by MusclePharm, upon five days prior written notice, if death, disability, physical injury, or other incapacity causes Endorser to be unable to perform a material amount of the personal or consulting services described in this Agreement.  Upon termination by MusclePharm because of death, disability, physical injury, or other incapacity, the rights to use Endorser's Name and Appearance will immediately be revoked unless agreed to in a separate written agreement executed by MusclePharm and either the Endorser or the Endorser's heirs.  If Endorser has performed all services required by this Agreement, MusclePharm will nonetheless be obligated to compensate Contractor with the entire Fee (or any remaining balance thereof).

356155.7
070714

(c)        Upon any termination of this Agreement, by MusclePharm for any reason permitted hereunder, MusclePharm shall not be liable to pay any compensation for services performed after the termination and Endorser shall not be obligated to perform any services after the date of a termination notice. However, if Endorser has performed all services required by this Agreement, then upon such termination, MusclePharm shall pay the full Fee (or any remaining balance thereof). In the event of a termination by Contractor pursuant to sub-paragraph (a) above, Contractor shall be entitled to exercise all rights and remedies to which Contractor and/or Endorser may be entitled.

11.      *Expenses:* If Endorser is required to travel to a location more than fifty (50) miles from Endorser's then-present location to render any of the services hereunder (a "Distant Location"), MusclePharm shall pay first-class, round-trip air transportation for Endorser and Endorser's travel companion, first-class hotel accommodations for Endorser and Endorser's travel companion (if an overnight stay is required), exclusive, first-class ground transportation to and from all airports and at all reasonable times at the Distant Location (including to and from the location(s) of Endorser's services) and a per diem (for Endorser only) of $200 per day. If Endorser's services are to be rendered in and around Endorser's then-current location, MusclePharm shall provide Endorser with first-class, exclusive ground transportation to and from the location(s) for Endorser's services. If requested, MusclePharm will provide Endorser with (or otherwise pay for) appropriate and reasonable security for Endorser for any public appearances or other services.

12.      *Approvals:* Contractor shall have prior written approval over Endorser's Name and Appearance to be used, and any and all uses of any such approved Name and Appearance in each instance, including, without limitation, the particular Products to be endorsed and/or associated with, the specific use(s) of the Name and Appearance (e.g., the manner used in point of sale material, all proposed editorial uses, etc.), the creative concepts for the use of Endorser's Name and Appearance (including, without limitation, any words to be spoken or otherwise associated with Endorser in any material), approval of all commercials, On-Line Content and the Article and approval of all written or oral statements, endorsements, testimonials or paraphrases thereof by Endorser to be used in any manner or media. In no event whatsoever shall MusclePharm use any materials, or proceed with any matter that is otherwise subject to Contractor's approval pursuant to this Agreement, without the prior written approval of the Contractor in each instance. With respect to any commercials produced in connection with this Agreement, MusclePharm shall submit storyboards to Contractor for review and approval, and the final commercials shall not materially differ from any such approved storyboards without Contractors further written approval. Contractor shall also have prior approval rights over any body double (if any), hair/make-up personnel, wardrobe stylist and wardrobe in connection with any of the services to be rendered hereunder. Any approvals that are required to be made by Contractor shall not be unreasonably withheld or delayed unless otherwise so stated herein.

13.      *Independent Contractor:* It is expressly agreed that Endorser is acting as an independent contractor in performing his services hereunder. MusclePharm shall carry no worker's compensation insurance or any health or disability insurance to cover Endorser. MusclePharm shall not pay any contributions to Social Security, unemployment insurance, federal or state withholding taxes, nor provide any other contributions or benefits that might be expected in an employer-employee relationship. Contractor shall be solely responsible and liable for reporting and paying all federal and state income or other taxes applicable to the compensation paid under this Agreement, and MusclePharm will provide Contractor with an IRS Form 1099 at the end of each calendar year in which compensation is paid to Contractor. It is further understood and expressly agreed by Contractor that Endorser has no right or authority to incur expenses, obligations or liabilities in the name of or binding on MusclePharm, and shall not represent to third parties that Endorser has any relationship (e.g., employer-employee or principal-agent) with MusclePharm other than the independent contractor arrangement set forth in this Agreement.

356155.7
070714

14.      *Indemnification:*  Each party agrees to indemnify, defend and hold the other harmless from and against any and all demands, claims or actions for loss, damage, or liability, including but not limited to, reasonable outside attorney's fees and disbursements (collectively, "Claims") arising from the indemnifying party's gross negligence, willful misconduct, or material breach or default by the indemnifying party of any of the representations, warranties, covenants, agreements, terms, or conditions of this Agreement.  Further, MusclePharm shall indemnify, defend and hold harmless Contractor and Endorser from and against any and all Claims arising from the development, production, broadcast, distribution and/or other exploitation of any materials in which Endorser's Name and Appearance (or any part thereof) appears (including, without limitation, any commercial(s)) and/or the manufacture, distribution, sale or use of any Products (including, without limitation, product liability claims).

15.      *Representations and Warranties:*  MusclePharm hereby represents and warrants (a) it has the right to enter into this Agreement and to perform all of its obligations hereunder; (b) it is no, and will not be, subject to any obligation, disability or restriction which will or might prevent it from fully complying with its obligations herein or which will create any liability on the part of Contractor and/or Endorser; (c) any act by MusclePharm or any third party in connection with the manufacture, development, production, quality control, sale and distribution of the Products shall not violate, infringe or otherwise conflict with any law, regulation, rule, this Agreement and/or the rights of any person or entity; (d) any act by MusclePharm or any third party in connection with the development, production, advertising, promotion and other exploitation of the materials to be used hereunder shall not violate, infringe or otherwise conflict in any material respect with any law, this Agreement and/or the rights of any person or entity; (e) the Products shall be free from all defects in material and workmanship; (f) it has obtained any and all necessary governmental licenses, permits, approvals, clearances, registrations or industry self-regulatory organization registrations necessary to manufacture, produce, sell and distribute the Products; (g) it has conducted and/or implemented any and all necessary testing, safety, environmental and quality control programs and studies whatsoever for the Products as may be required by law, rule, regulation, good manufacturing practice, industry standards or customs, or otherwise; (h) any and all statements or claims made regarding the Products, whether or not including Endorser, shall be true and correct in all material respects and shall contain all disclaimers, warnings and/or advisories required or suggested by law, rule, regulation, good manufacturing practice, industry standards or custom or otherwise with respect to the Products; and (i) the label for the Products shall contain any and all disclaimers, warnings and/or advisories required by law, rule, regulation, good manufacturing practice, industry standards or custom or otherwise.

16.      *Non-Competition:*  During the Term of this Agreement, or any extensions of this Agreement, and except as set forth in Section 5 of this Agreement with respect to the Excluded Products, if applicable, the Endorser shall not advertise, promote or endorse any products in the Exclusive Product Categories with any company other than MusclePharm. Nothing contained in this Agreement will restrict Endorser's ability to appear in or promote the entertainment portion of any television, internet, radio program, feature film, or charity event regardless of such program's or film's sponsor(s) or advertiser(s) or any products placed or integrated therein, or to appear at events (e.g., make an appearance on the so-called "red carpet") involving multiple sponsors that may include products in the Exclusive Product Categories or to allow customary uses of Endorser's name or likeness in connection with so-called commercial tie-ins for any such programs or films.

17.      *Conduct:*  Contractor represents and warrants that before and during the Term, Endorser has not nor shall commit any felonious act or an assault or battery, nor any act of moral turpitude (including any criminal offense involving a minor or animal welfare) (a "Morals Violation"). In the event of a Morals Violation by Endorser, MusclePharm may only terminate or suspend this Agreement if it  allows Contractor (either in a live meeting or via phone call) an opportunity to provide MusclePharm with a verbal and written  explanation of the alleged Morals Violation (it being agreed that Contractor is not

obligated to do so) and to the extent that Contractor provides MusclePharm with such explanation, MusclePharm considers Contractor's explanation (if any is given) in good faith before making any decision as to the exercise of its termination or suspension rights. Thereafter, MusclePharm shall have the right, to terminate or suspend this Agreement upon written notice without further obligation, and upon such termination, and MusclePharm shall cease all use of the materials embodying the Name and Appearance; provided the MusclePharm will not be in breach if materials embodying the Name and Appearance granted to MusclePharm and created before the termination of this Agreement continue to be used by third parties in the manner set forth in this Agreement for up to six (6) months from the date of termination; provided that MusclePharm shall use all reasonable efforts to notify such third parties of the termination of this Agreement and to cause such third parties to cease such use immediately. Endorser will promptly disclose to MusclePharm any circumstances arising during the Term that might reasonably be considered to amount to a Morals Violation.

18.     *Assignment:* This Agreement is for the personal services of the Endorser and is entered into in reliance upon and in consideration of the reputation and celebrity of Endorser. Endorser shall therefore not voluntarily or by operation of law assign or otherwise transfer the obligations incurred on his part pursuant to the terms of this Agreement without the prior written consent of MusclePharm. Any attempted assignment or transfer by Endorser of his obligations without such consent shall be void.

19.     *Modification of Agreement:* The parties may modify this Agreement hereto only by a written supplemental agreement executed by both parties.

20.     *Notice:* Any notice required or permitted to be given hereunder shall be sufficient if given in writing, and sent by registered or certified mail, postage prepaid, or by courier such as FedEx, addressed as follows:

If to MusclePharm:

MusclePharm Corporation
4721 Ironton Street
Denver, CO 80237
Attn: Brad Pyatt, CEO
Fax: 800-490-7165

With a copy to:

Sichenzia Ross Friedman Ference LLP
61 Broadway, 32nd Floor
New York, NY 10006
Attn: Harvey J. Kesner, Esq.
Edward H. Schauder, Esq.
Timothy O'Brien, Esq.
Fax: 212-930-9725

If to the Contractor or Endorser:

For all payments:

JMAN2 General III, LP
c/o Tricia Teegardin Edwards, CPA, CFP
TEEGARDIN & ASSOCIATES
500 N. Capital of Texas Hwy, Bldg 4-100
Austin, Texas 78746
Attn: Tricia Teegardin
Phone: 512-346-6477
Fax: 512-346-6415

For all notices:

JMAN2 General III, LP
3600 North Capital of Texas Highway,Suite 350
Austin, TX 78746
Attn: Brad Beckworth
Phone: 903-645-7128
Fax:  903-645-4415

With copies to:

356155.7
070714

LRMR Management Company, LLC
3800 Embassy Parkway, Suite 360,
Akron, OH 44333
Attention: Maverick Carter and Michele Campbell
Phone: 216-771-2323
Fax: 216-771-2333

Grubman Shire & Meiselas
152 West 57th Street, 31st Floor
New York, NY 10019
Attention:  Lawrence Shire and Peter Grant
Phone: 212-554-0448
Fax:  212-554-0444

or to such other address as the parties hereto may specify, in writing, from time to time. Written notice given as provided in this paragraph shall be deemed received by the other party two business days after the date the mail is stamped registered or certified and deposited in the mail, or deposited with courier.

21.     *Governing Law:*  This Agreement has been executed and delivered in New York County in the State of New York, and its interpretation, validity and performance shall be construed and enforced in accordance with the laws of the State of New York.  Venue for any proceeding to interpret, construe or enforce this Agreement shall be New York County, New York, whether such proceeding is in a court of competent jurisdiction or pursuant to mediation or arbitration proceedings.

22.     *Dispute Resolution:*  Any controversy, dispute or question arising under this Agreement shall be determined, if possible, by good faith mediation, arbitration or comparable alternative dispute resolution proceedings agreed to by the parties.  In the event the parties cannot agree upon alternative dispute resolution procedures to resolve their disagreements, then either party may resort to litigation in a court of competent jurisdiction in Denver County, Colorado.  In connection with any alternative dispute resolution proceedings, including mediation or arbitration, the parties shall share equally the cost and expense of the alternative dispute resolution proceeding, and each party shall be responsible for its own attorneys' fees. In the event either party resorts to litigation, the provisions of Colorado law will govern the award of attorneys' fees as a remedy.

23.     *Binding Effect:*  This Agreement when signed by the parties shall be binding upon the parties, and their respective heirs, successors or legal representatives.

24.     *Payments:*  All cash payments shall be made via wire transfer to the endorser to an account provided by endorser or his representative.

25.     *Trademarks:*  Nothing contained in this agreement shall be construed to convey to MusclePharm any right to use the trademarks, logos, team identifications, uniforms, or uniform numbers ("Marks") of any professional, collegiate, or amateur football association and/or league (including any member clubs or teams of such association and/or league) including, but not limited to the NFL, any NFL Team, the NCAA, or any NCAA Team in conjunction with the services provided in this agreement. MusclePharm must acquire all rights to the use of such Marks from the appropriate rights holder.

26.     *Insurance:*  During the Term and for three (3) years thereafter, MusclePharm shall be required to obtain and  maintain, in full force at its sole cost and expense, (a) comprehensive and general liability insurance, including product liability insurance, providing coverage against, but not limited to, all forms

11

of liability for any injury, loss or damage relating to, among other things, the manufacture and distribution of the Products and the production, publicity and other exploitation of the commercial (s) and any other acts of MusclePharm, its affiliated and related entities and their respective licensees, successors and assigns and any officer, director, member, principal, representative, agent, contractor or employee of each of the foregoing; and (b) a separate errors and omissions insurance policy providing coverage against, but not limited to, all forms of liability for any injury, loss or damage relating to, among other things, the production, publicity and other exploitation of the commercial(s), the On-Line Content and any other acts of MusclePharm and/or any officer, director, member, principal, representative, agent, contractor or employee of MusclePharm, each with policy limits of not less than Three Million Dollars ($3,000,000) per occurrence and Five Million Dollars ($5,000,000) in the aggregate. The Parties agree that (i) the deductible on any insurance policy acquired hereunder shall not exceed Twenty Thousand Dollars ($20,000) (for which MusclePharm shall be responsible); (ii) the insurance policy shall have only those exclusions from coverage approved by Contractor; (iii) each of Contractor, Endorser and their respective affiliated and related entities and their successors, licensees and assigns and the officers, directors, members (if any), shareholders (if any), principals, representatives, agents, contractors and employees of each of the foregoing shall be named as additional insured on the applicable insurance policies; (iv) the insurance policies shall be endorsed to provide no less than thirty (30) days notice to all insureds if any insurance benefit decreases or lapses; (v) each such policy shall provide for primary coverage and not contributory coverage notwithstanding any other insurance which Contractor and/or Endorser may obtain or maintain; (vi) all insurance shall be purchased from carriers licensed to do business in all states and shall have no less than an "A" rating (or equivalent thereof) in the most current edition of A.M. Best's Guide; and (viii) MusclePharm shall provide Contractor and Endorser with a complete copy of such insurance policies and certificates establishing the existence of such insurance in accordance with the terms hereof simultaneously with the execution of this Agreement.

27.      *Entire Agreement:*  This Agreement contains the entire contract of the parties with respect to the subject matter hereof and supersedes all agreements and understandings between the parties concerning the subject matter hereof.  The language in all parts of this Agreement shall in every case be construed simply according to its fair meaning.

28.      *Counterparts:*  This Agreement may be executed by fax and/or .pdf in two (2) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. A photocopy of a signature or a facsimile or digital copy of a signature shall be treated as an original.

*The remainder of this page intentionally left blank*

12

This Agreement when signed and dated by both parties shall be deemed to be made, accepted and delivered in the City and County of Denver, Colorado, regardless of where the Agreement is executed by the parties.

MusclePharm Corporation                           JMAN2 General III, LP

By: Name: Brad Pyatt, CEO                         By: Paul Manziel, Manager

Date: July 15, 2014                               Date: July 15, 2014

To induce Company to enter into the foregoing Agreement with Contractor, I acknowledge that I have read the foregoing Agreement and I hereby approve its terms and agree to perform the obligations and abide by the restrictions contained therein which are applicable to me. I confirm that Contractor is authorized and empowered to act on my behalf in connection with the foregoing Agreement.

Jonathan P. Manziel

13

356155.7
070714

| | |
|---|---|
| District Court Denver County, Colorado<br>Court Address: Denver City & County Building<br>1437 Bannock Street, Room 256<br>Denver, CO 80202 | DATE FILED: April 17, 2018 2:29 PM<br>FILING ID: 6597290B6655B<br>CASE NUMBER: 2018CV31358 |
| Plaintiff(s):  JMAN2 General III, LP<br><br>v.<br><br>Defendant(s):  MusclePharm Corporation | ▲   **COURT USE ONLY**   ▲ |
| Attorney or Party Without Attorney (Name and Address):<br>Bradley E. Beckworth (pro hac vice forthcoming)<br>Jeffrey J. Angelovich (pro hac vice forthcoming)<br>Cody L. Hill (pro hac vice forthcoming)<br>NIX, PATTERSON & ROACH, LLP<br>3600B N. Capital of Texas Hwy., Suite 350<br>Austin, TX 78746<br>Tel:  (512) 328-5333<br>Fax: (512) 328-5332<br>Email:  jangelovich@nixlaw.com<br>          bbeckworth@nixlaw.com<br>          codyhill@nixlaw.com<br><br>Valeri S. Pappas #29939<br>Jennifer A. Tiedeken, #42674<br>DAVIS & CERIANI, P.C.<br>1600 Stout Street, Suite 1710<br>Denver, Colorado 80202<br>Tel:  (303) 534-9000<br>Fax: (303)534-4618<br>Email: vpappas@davisandceriani.com<br>          jtiedeken@davisandceriani.com | Case Number:<br><br><br><br><br>Division          Courtroom |

## DISTRICT COURT CIVIL (CV) CASE COVER SHEET FOR INITIAL PLEADING OF COMPLAINT, COUNTERCLAIM, CROSS-CLAIM OR THIRD PARTY COMPLAINT

1.  **This cover sheet shall be filed with each pleading containing an initial claim for relief in every district court civil (CV) case, and shall be served on all parties along with the pleading.**  It shall not be filed in Domestic Relations (DR), Probate (PR), Water (CW), Juvenile (JA, JR, JD, JV), or Mental Health (MH) cases. Failure to file this cover sheet is not a jurisdictional defect in the pleading but may result in a clerk's show cause order requiring its filing.

2.  **Check one of the following:**

    ☐ This case is governed by C.R.C.P. 16.1 because:

    -   The case is not a class action, domestic relations case, juvenile case, mental health case, probate case, water law case, forcible entry and detainer, C.R.C.P. 106, C.R.C.P. 120, or other similar expedited proceeding; *AND*

    -   A monetary judgment over $100,000 is not sought by any party against any other single party. This amount includes attorney fees, penalties, and punitive damages; it excludes interest and costs, as well as the value of any equitable relief sought.

    ☒ This case is not governed by C.R.C.P. 16.1 because (check ALL boxes that apply):

☐ The case is a class action, domestic relations case, juvenile case, mental health case, probate case, water law case, forcible entry and detainer, C.R.C.P. 106, C.R.C.P. 120, or other similar expedited proceeding.

☒ A monetary judgment over $100,000 is sought by any party against any other single party. This amount includes attorney fees, penalties, and punitive damages; it excludes interest and costs, as well as the value of any equitable relief sought.

☐ Another party has previously indicated in a Case Cover Sheet that the simplified procedure under C.R.C.P. 16.1 does not apply to the case.

*NOTE: In any case to which C.R.C.P. 16.1 does not apply, the parties may elect to use the simplified procedure by separately filing a Stipulation to be governed by the rule within 49 days of the at-issue date. See C.R.C.P. 16.1(e).  In any case to which C.R.C.P. 16.1 applies, the parties may opt out of the rule by separately filing a Notice to Elect Exclusion (JDF 602) within 35 days of the at-issue date.  See C.R.C.P. 16.1(d).*

☐ A Stipulation or Notice with respect to C.R.C.P. 16.1 has been separately filed with the Court, indicating:

☐ C.R.C.P. 16.1 applies to this case.

☐ C.R.C.P. 16.1 does not apply to this case.

**3.** ☒ This party makes a **Jury Demand** at this time and pays the requisite fee.  *See* C.R.C.P. 38.  (Checking this box is optional.)

☒ By checking this box, I am acknowledging I am filling in the blanks and not changing anything else on the form.

☐ By checking this box, I am acknowledging that I have made a change to the original content of this form.

Date: April 17, 2018

*s/Valeri S. Pappas* _____
Signature of Party or Attorney for Party